PROFESSIONAL SERVICE INDUSTRIES, INC., APPELLANT, V. J. P.
CONSTRUCTION, INC., APPELLEE.

491 N.W.2d 351

Filed November 6, 1992.   No. S-90-022.

Christopher J. Connolly, of Thompson, Crounse, Pieper & Brumbaugh, P.C., for appellant.

Monte Taylor, of Taylor, Connolly & Kluver, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This action arises from an agreement to perform testing services at an estimated cost for a road paving project. Plaintiff, Professional Service Industries, Inc. (PSI), which provided the testing services, appeals the dismissal of its petition and the award of a judgment on the counterclaim filed by appellee, J. P. Construction, Inc., the prime contractor.

PSI asserts on appeal that the trial court erred in determining that there was both a fair intent of the parties and a duty imposed on PSI that PSI would hold close to its estimated cost figure. Furthermore, PSI claims that the court altered the agreement, without finding that an ambiguity existed, by

finding that the stated estimated cost was in fact a fixed price precluding PSI's recovery of certain charges and alternatively awarding J. P. Construction reimbursement for overpayment. We find that the terms of the agreement are sufficiently definite and certain to create a valid and enforceable service requirements contract, and no ambiguity being found, we reverse, and remand.

In the spring of 1986, J. P. Construction obtained a bid for road paving construction at Offutt Air Force Base in Bellevue, Nebraska. Prior to submission of its bid, J. P. Construction received a subcontracting proposal from PSI for various quality control testing services. PSI submitted a written proposal, based on estimated fees, to perform soil compaction, concrete, asphalt, and other similar paving tests at a cost of $71,000. The proposal contained the schedule of unit prices for the various laboratory tests and hourly technical manpower rates which PSI routinely charged.

Once J. P. Construction was awarded the bid, a written "Standard Sub-Contract Agreement" form (the agreement) was signed by both parties. The agreement provided that PSI would supply the required testing services for an estimated $44,000. The original proposal and fee schedules submitted by PSI were stapled to the agreement. No other documents were attached to the agreement.

Aside from the preprinted form language, the pertinent typed language of the agreement reads as follows: "Total Sub-contract (estimated) $44,000.00[.] Invoiced on a Unit Price Basis, either on a cost per hour or a cost per test. PSI Agreement Attached."

The agreement was silent as to costs for retests. However, on the "Schedule of Services" attached to the PSI proposal, the following language, with original emphasis retained, appears: "*Retests*, for non compliance, have not been considered in the estimate. Generally, retesting materials for qualification purposes will require a minor fee. Retesting failures of material placement will require extra field time."

Work commenced in June 1986. PSI provided testing services whenever requested and submitted monthly invoices based on the service rates listed in the proposed schedule of fees.

J. P. Construction initially paid these bills without protest. However, 15 months into the project, J. P. Construction realized the total monthly billings had exceeded the $44,000 estimate and refused to make further payments.

PSI subsequently filed suit, seeking payment of $15,786.68 plus accrued interest for services furnished on open account. Denying that any amounts were due PSI, J. P. Construction counterclaimed for reimbursement of $8,617.64 paid above the estimated amount and for an accounting to determine the improper charges.

At trial, the parties gave conflicting explanations for the variance between the proposed figure and the final written agreement estimate. J. P. Construction asserted that PSI primarily changed its proposal because of a competitor's bid of $45,000. J. P. Construction maintained that PSI agreed to reduce its originally proposed figure because PSI could economize on time and charges due to other concurrent projects PSI had at Offutt Air Force Base. J. P. Construction also claimed that the price was estimated to cover any unforeseen quantity changes in materials, but that, in fact, no surprises occurred that required unforeseen additional work.

Conversely, PSI asserted that after learning of other competitors' proposals, PSI agreed to reduce its price to reflect an estimated amount based on unit prices for each testing service actually requested by J. P. Construction instead of a guaranteed set amount. PSI further asserted that the variance between the $44,000 estimate and the final total charges of $68,404.32 was justified in part because (1) the project was not shut down in the winter months as expected, (2) the project took approximately 3 months longer to complete than scheduled, (3) retests were not taken into consideration in the projected estimate, (4) the project required more retests than normal, and (5) control charts were requested to be prepared which were not part of the original agreement.

The court reviewed the original PSI proposal and calculated the originally anticipated manpower costs. The court then subtracted this manpower cost from the original proposed cost of $71,000 and arrived at an estimated lab testing expense. By comparing this anticipated lab testing expense with the actual

invoiced costs, the court determined that J. P. Construction had received $3,745.84 worth of additional unanticipated laboratory tests.

Finding that the fair intent of the parties was that PSI was to "hold closely to its estimate," the trial court held that PSI had failed in its duty to reduce either the number of hours or the hourly costs to come within the intent of the parties. The court dismissed PSI's claim with prejudice and awarded J. P. Construction a judgment against PSI in the amount of $4,871.80 (the $8,617.64 demand minus the $3,745.84 for additional tests). PSI appealed.

The parties do not dispute, nor do we discern any reason to otherwise hold, that the written agreement is a binding contract. Instead, the center of the present controversy is the proper construction of the contract.

Generally, the proper construction of a written contract and an examination of a contract for ambiguity are questions of law. See, *Spittler v. Nicola*, 239 Neb. 972, 479 N.W.2d 803 (1992); *Luschen Bldg. Assn. v. Fleming Cos.*, 226 Neb. 840, 415 N.W.2d 453 (1987). Furthermore, in a judgment under review, an appellate court has an obligation to reach a conclusion on questions of law independent of the trial court. *Nebraska Builders Prod. Co. v. Industrial Erectors*, 239 Neb. 744, 478 N.W.2d 257 (1992).

We first note that this contract is for the performance of services, that therefore the Uniform Commercial Code is inapplicable, and that common-law principles of construction or interpretation of a document apply. When construction of a contract is necessary, the court must construe the contract as a whole, giving effect to every part thereof if possible. *Crowley v. McCoy*, 234 Neb. 88, 449 N.W.2d 221 (1989). The court may also consider the conduct of the parties in performing the contract to ascertain the parties' intent regarding their contract. *Wurst v. Blue River Bank*, 235 Neb. 197, 454 N.W.2d 665 (1990).

The contract consists of a preprinted standard subcontract agreement, with typewritten additions, provided by J. P. Construction and signed by both parties. Stapled to and incorporated by reference is the original PSI proposal. While

some testimony at trial indicated that the contract provisions were to be augmented in light of the plans and specifications, it is not apparent if these documents were admitted at trial. Nevertheless, these documents were not included in the record brought up on appeal and therefore are precluded from consideration.

As the PSI proposal predates the agreement by approximately 7 weeks, any conflicting provisions between the two attached documents will be construed in favor of the more recent agreement. We first note that the proposed $71,000 figure is negated by the $44,000 estimate in the agreement. However, there is no language in the entire document to indicate that the estimate is either a guaranteed maximum or minimum figure. There is nothing to manifest that the $44,000 figure is anything more than it states it is: an estimate.

The proposed schedule of fees for field personnel and laboratory testing was not altered, modified, or contradicted by language in the agreement to reflect an intent to change the unit price bases. The express language in the proposal stating that fees for retesting were not taken into consideration in the estimate is not illuminated or negated by any preprinted or typed language in the standard form. Both the agreement and the proposal are silent as to costs for control charts.

Additionally, the objective intent of the parties to contract for services on a per-hour or per-test basis, at the request of J. P. Construction, is emphasized by consistencies between the two documents. For example, the typed language in the agreement reads "[i]nvoiced on a Unit Price Basis, either on a cost per hour or a cost per test." This language corresponds with the language of the proposal which reads, "PSI proposes . . . to accomplish the work on a unit price basis in accordance with the attached Schedule of Services and Fees [to] be determined by the actual amount of technical time expended for this project and the amount of laboratory testing performed."

The express language of the agreement and incorporated schedule of services and fees, when read as a whole, is not ambiguous. Having resolved any perceived conflicts in the contract terms and provisions, we find that the plain language of the resulting instrument is not susceptible to more than one

reasonable interpretation.

This interpretation is further supported by an objective view of the conduct of PSI and J. P. Construction while performing under the contract. We have previously noted that " 'the interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of true intent and should be given great, if not controlling, influence.' " *International Harvester Credit Corp. v. Lech*, 231 Neb. 798, 803, 438 N.W.2d 474, 478 (1989) (citing *Nowak v. Burke Energy Corp.*, 227 Neb. 463, 418 N.W.2d 236 (1988), and *Marvin E. Jewell & Co. v. Thomas*, 231 Neb. 1, 434 N.W.2d 532 (1989)).

The objective conduct of the parties manifests an intent of the parties to create a service contract for testing-service requirements at the proposed fees and costs. The monthly invoices identify each completed service by a description that corresponds to the proposed schedule lists of field personnel or laboratory fees. The cost for each of these described services is identical to the scheduled fees in the proposal. Furthermore, J. P. Construction paid these clearly identified unit-cost charges, without protest, for 15 months.

"When the terms of a contract and the facts and circumstances that aid in ascertaining the intent of the parties are insufficient to raise an issue of fact, the interpretation of the contract is a matter of law." *International Harvester Credit Corp.*, 231 Neb. at 804, 438 N.W.2d at 478. A fair interpretation of the contract leads to the conclusion that in the absence of allegations and evidence of either bad faith or unconscionability, the contract formed by the parties here is valid, enforceable, and unambiguous as a matter of law. The PSI-J. P. Construction contract clearly provides that the $44,000 figure is an estimate and that the services were to be billed and paid, in compliance with the fee schedules, as the services were requested and completed.

When a contract is unambiguous, the court must look solely to the contents of the contract to ascertain the parties' intent and not to a party's understanding or belief. *Albee v. Maverick Media, Inc.*, 239 Neb. 60, 474 N.W.2d 238 (1991). "Parties are bound by the terms of the contract even though their intent may

be different from that expressed in the agreement." *International Harvester Credit Corp.*, 231 Neb. at 802, 438 N.W.2d at 477. In a few limited instances, a court may properly imply contractual terms not expressly provided for by the parties. However, we find no case law to support the trial court's theory that a duty to hold close to an estimate arises simply because an estimated figure is stated. On the contrary, when an estimated figure is a guaranteed maximum or minimum, or when the parties expressly provide otherwise, only then may the court treat the estimate as a fixed amount to which the parties are contractually bound. See, *Ruzicka v. Petersen*, 213 Neb. 642, 330 N.W.2d 913 (1983); *Griswold & Rauma, Architects v. Aesculapius Corp.*, 301 Minn. 121, 221 N.W.2d 556 (1974).

Having determined that the parties clearly expressed a written intent to contract for a particular result, we find that it was not the province of the trial court to speculate about the subjective intentions of the parties and to rewrite the agreement to provide terms contrary to those expressed. See *Husen v. Husen, ante* p. 10, 487 N.W.2d 269 (1992). Consequently, we find that the district court erred in finding that it was both the intent of the parties and the duty of PSI to hold close to the estimate.

In conclusion, we find that it was error for the district court to order the dismissal of appellant's petition, to independently assess the service costs, and to award the appellee a judgment on its counterclaim. Therefore, the order and judgment are reversed, and the cause is remanded to the district court to enter judgment consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.